Case number 18-5353, Massachusetts Lobstermen's Association, et al. Appellants versus Wilbur Ross in his official capacity as Secretary of the Department of Commerce, et al. Mr. Wood for the appellants, Mr. Cooper for the appellees, Mr. Zorlo for the dependents, intervenors, appellees, et al. Thank you. Good morning. May it please the Court, I'm Jonathan Wood and I'm representing the appellants, whom I'll refer to collectively as the fishermen, in declaring the 5,000 square mile Northeast Canyons and Seamounts Marine National Monument. The President violated the separation of powers and exceeded his authority under the Antiquities Act. A full century after that law's enactment, the President first asserted the significant and novel authority to designate national monuments in areas over which the federal government exercises only limited authority, including this area of the ocean at issue here. The Supreme Court precedent requires significant skepticism of such aggrandizing claims. That interpretation also rendered practically redundant the National Marine Sanctuaries Act, which is this specific and comprehensive statute Congress enacted to set aside areas of the marine environment. And finally, the interpretation cannot be squared with the Antiquities Act's text, which limits national monuments to, quote, land owned or controlled by the federal government, which as the Fifth Circuit correctly held, excludes the ocean beyond the territorial sea. Now, in the interest of time, I'm going to focus my remarks today on the question of what control means in that statute, as well as the Marine Sanctuaries Act, but I'm happy to take questions on any of the issues. Starting with control, Treasurer Saubers interprets the phrase correctly to exclude areas over which federal authority is of limited scope. That interpretation comes from the text of the statute. Under Taniguchi, the Supreme Court said that even if a dictionary definition would admit of a range of interpretations of a word, that doesn't mean that the broadest interpretation is the ordinary meaning of that word for purposes of a statute. And here we know that that broadest interpretation, which the government offers, is not the correct interpretation faithful to the text, because Congress chose to group the word controlled with the word owned. And in the familiar rule, a word is known by the company it keeps. That implies that the amount of authority the government must have to exercise control over an area must be similar to that which the government Is this part of the Outer Continental Shelf? Yes. Congress defined Outer Continental Shelf in 43 U.S.C. 1331 as above the law, subo, subet, appertaining to the United States and are subject to its jurisdiction and control. Do you think control for purposes of the Antiquities Act has a different meaning than control in the Outer Continental Shelf? I do, and I think context provides the reason for that. Obviously, in the context of the Outer Continental Shelf Lands Act, where they're defining an area that is beyond the territorial sea as controlled for purposes of that statute, control must include that area. But under the Antiquities Act, we don't have that sort of context. There is no evidence in the text of the statute, the history of the statute, or its purpose. What kind of control are they exercising under the Outer Continental Shelf Act? They exercise the authority to the extent authorized by international law. So they can do things like regulate the drilling for oil on the Outer Continental Shelf and the acquiring of other resources. Protect resources? Some resources. Most of the resource protection comes from other statutes. Preserve and protect resources as part of their control under this statute as well as other statutes? Under international law, the federal government can protect certain resources from certain activities. That authority comes from different statutes. So one of the primary ones is the Marine Sanctuaries Act as well as the Madison-Stevens Fisheries Act. But the mere fact that Congress can regulate... But we submit that's not what controlled means in terms of... Okay. But just to be clear, you agree that, as Congress said here and has said in other statutes, it exercises sufficient control in this very area to protect, preserve, maintain, prevent people from moving to the waters consistent with international law in this very area? It depends on what activity they're regulating, but the answer, I think, to your question is yes. Congress has the authority and has exercised this authority under the Marine Sanctuaries Act. It has defined this area as an area under its legislative United States regulatory control as long as it's consistent with international law. For purposes of that statute, yes. For purposes of lots of statutes. Yes, and generally when it has done so, the context makes clear that Congress is defining that term to include the area, and we have none of that context here. I don't understand why your answers to Judge Millett aren't basically precluded by this, by Parker, which we were given under a 28-year letter, right? The Supreme Court's... I'm sorry. I misunderstood you. Parker, the Supreme Court's Parker decision... It did not interpret control under the statute. It said that the Federal Government exercises, quote, exclusive control over the outer continental shelf. And the context of that opinion matters. Exclusive control, and this is you told Judge Millett that this monument is on the continental shelf, right? For the most part, I'm not sure... So the Supreme Court basically says that the U.S. Government exercises exclusive control over where this monument's created, right? I don't understand what's left of your argument after that. So what the Supreme Court was saying in that case is that this area can be regulated by the Federal Government, it can't be regulated by the states. That the Federal Authority is exclusive as to the states, but that doesn't speak to the extent of Federal Authority. In the text of the Antiquities Act, the history of its implementation and its purpose show that the amount... President Reagan said that the Federal Government also has sovereign rights and jurisdiction over this same area vis-a-vis other nations as well as the states. Is that correct? It goes on to explain what those rights... Just ask me if that's correct, you said that. Yes, that phrase does appear in the U.N. Convention, but the convention goes on to explain what those rights are, and they fall far short of the amount of control required in the Antiquities Act. Sorry, what does sovereign rights and jurisdiction in the 1983 proclamation? Can you tell me what those mean, what that covers? It means some of this is provided in the convention, but it authorizes the Federal Government to Congress to regulate fishing, to protect fisheries, to regulate the extraction of certain resources to protect the marine environment. But international law is equally clear that Congress does not exercise the sort of plenary authority that the Antiquities Act requires. Most central to this case, Congress cannot protect the acquisition of antiquities in this area. Anyone could go and acquire a submerged ship beyond the territorial sea, and international law does not allow Congress to regulate that. So if you're going to interpret control under the Antiquities Act, it makes sense to consider the primary purpose of that statute, which is to protect antiquities and other historic artifacts. And that purpose is completely inapplicable here. As I said, I think the better reading of control in this statute is that the Federal Government must exercise plenary power. The President said it had to do with the right to conserve and manage natural resources. That was part of the sovereign right. Is that part of their sovereign right, to conserve and manage natural resources? Or did he just have it wrong? No, he had it right that the Federal Government can regulate certain activities for that purpose. And protect and preserve marine environments. That was true, too. The power that they have under the 1983 proclamation, which wasn't an issue yet and didn't exist at the time of the Fifth Circuit case, includes conserving and managing. I wouldn't say that that authority didn't exist in 1978. It was different. So you had some of the statutes of government. It hadn't been recognized by the President at that point. It hadn't been declared. A different proclamation governed at that time. This was a new proclamation that somewhat expanded federal authority or recognized somewhat expanded federal authority. But still acknowledged that... I just want to be clear. But when you say this power that was asserted to conserve and manage natural resources, and to preserve marine environment, that's not consistent with the power of the Antiquities Act? To preserve? That's not enough. The power to preserve is not enough? No, because the Federal Government exercised that power over many areas in which the Antiquities Act cannot apply, including private property. The Federal Government regulates to protect environmental assets on private property all the time under the Clean Water Act, the Endangered Species Act. And I think all the parties agree that owned or controlled must be interpreted to exclude private property. The Treasurer Sauber's interpretation achieves that necessary result. The competing interpretations from the defendants do not. Is there any private property out in the Outer Continental Shelf? No, but the Court has to interpret this phrase. Is there anyone else asserting sovereign rights, jurisdiction, and statutorily defined control in this area? No. Under the U.N. Convention, this area is generally treated as high seas, except to the extent that the nearest nation is given certain rights to regulate, mostly regulating fisheries as well as regulating the extraction of certain resources. I asked you about Parker. Let me ask you about a different Supreme Court case. What about what do you do with the Supreme Court case involving Devil's Pool, the capper, where it says the President had authority to designate the pool despite the fact that, as the Court recently explained in Sturgeon, quote, the Federal Government neither owns the pool nor exercise plenary authority over it. That has to do with the nature of water rights? No, but it said I didn't have plenary authority over the pool, yet it could be designated as a monument. Your whole argument is you require plenary authority, correct? Yeah, it's a pool. It's not the Atlantic. That's true. That's different. But it says right in there you do not have to have plenary control. The Federal Government did exercise plenary control. That pool was located on Federal land, which the Federal Government had owned for, I believe, over a century. It says the Federal Government neither owns the pool nor exercise plenary authority over it. And in the context, what it's talking about is the rights to the water in the pool. Capered is a reserved water rights doctrine case. And so the government can control the activities in the pool, but doesn't own the actual liquid itself. But under most Western states and most Western water law, you only have the rights to certain uses of water. And that's why the reserved water rights doctrine comes in. But if the power to designate submerged areas comes from capered, it wouldn't apply here because that doctrine is limited to areas within the public domain, areas over which the Federal Government exercises the plenary control that we think the Antiquities Act requires and the Fifth Circuit's interpretation supports. In fact, if you look from 1906 when the statute was enacted until 2006, a century later, the only areas in which any monuments were designated were areas in which that control existed. Federal land, Indian lands, Federal territories, and until Congress overruled it, the territorial sea. It was only in 2006, a hundred years after the statute was enacted, the President first asserted that control was far broader and could reach any area in which the Federal Government could regulate for certain purposes. If you accept that interpretation, that control is coextensive with Congress's authority to regulate, the unavoidable result is that the President can designate a monument on private property. I just want to be crystal clear here. The argument you're making now, are you no longer arguing, as you argued in your brief, that this is not land? No, I'm also arguing that, but I think they're two separate questions. Okay. And so it both has to be land, which we explain in our brief why this isn't land under the ordinary meaning. But then if it's land, it also has to be controlled. And what I'm talking about now is the extent of Federal authority required to constitute control, and that has to be more. Do you agree that submerged lands are included within the Antiquities Act? The Supreme Court has told us that. The Supreme Court in dicta has said that, and we acknowledge our argument is somewhat in tension with those sentences. Somewhat in tension with. Yes. But we explain why this case can be distinguished. Let's assume we're humble people here who don't feel like we can disagree with the Supreme Court's very considered statements, and some might argue an actual holding in at least one of the cases. I completely. Okay. So if submerged lands are in, are you still making a textual argument that submerged lands are not lands if they are just outside, a few feet outside the territorial waters, but would be land if within? Or is that really the control issue? Well, our primary argument is controlled, but I think if you take the Supreme Court's dicta on face value, and that this authority to designate submerged lands comes from Capert's discussion of the reserve water rights, then it would stop at the territorial seat because that doctrine only applies in areas within the public domain. Now, that somewhat bleeds together the land issue. Both as to control and lands, or if you want to just answer as to control, that's what you want to focus on here. Are you making sort of what we would call in an APA context a Chevron step one argument, or do you acknowledge ambiguity and you're relying on other indicia? I think the statute as a whole compels our interpretation. We're also relying on ordinary statutory instructions. So there's ambiguity in a Chevron step one argument. This isn't a Chevron case. This isn't a Chevron step one argument. This isn't a Chevron case. I get that. This Court in Mountain State said that the Court has to interpret the statute, but we believe the text of the statute supports our result, as does other Kansas statutory interpretation purpose in the history. If you're looking for a textual hook, I think the biggest one is subsection C of the same provision, which necessarily implies that owner control must be interpreted to exclude private property. Defendants try to avoid the problem in the interpretation which would include that area by reinterpreting that section as an explicit limit to prohibit the designation of private property, but the text can't get that result. The only way to reconcile these two sections is to interpret the phrase owner control in a way that would exclude private property. Our interpretation does that, and neither of the other interpretations do. If there are no more questions, I will reserve the ten seconds I have remaining for rebuttal. You've got it. May it please the Court, Avi Kupfer for the Federal Appellee is joining me at Council's table. It's Catherine DeSorma who represents the interviewers, and we'll be taking five minutes of argument time. Beginning with the issue of the proper construction of the word control in the phrase owned or controlled by the Federal Government of the Antiquities Act, there's a key Supreme Court case that my colleague chose not to discuss, and that's the 1978 United States v. California case, where the Supreme Court stated that the submerged lands in the territorial sea were under the control of the United States for purposes of the Antiquities Act, even though other states in the United States exercised police powers over that area, and at the time, under international law, there were certain freedoms of navigation in the territorial sea as well. And in that case, the Court recognized that the United States' control over the territorial sea was broad, but it wasn't exclusive. And that's a case that's squarely interpreted, the meaning of the word control in the Antiquities Act, applying it to an area where the United States exercises more control than it does over the EEZ, but not absolute control, which is the preferred interpretation of my colleague. That case was also decided against the backdrop of, at the time, more than 50 years, I believe, of presidents of both parties designating monuments in the territorial sea since 1935. So those are two key points with respect to the definition of control, the longstanding historical application. Can I just ask, is all of the exclusive economic zone part of the Outer Continental Shelf? I mean, are those two terms synonymous? No. Okay. Is this entire monument within the Outer Continental Shelf? There is part of the canyon, I'm sorry, the seamounts, that is beyond the Outer Continental Shelf, but within the exclusive economic zone. But as you mentioned earlier, Judge Millett, there are many environmental protection statutes that reach beyond the Outer Continental Shelf and the exclusive economic zone. The Endangered Species Act, the Marine Mammal Protection Act, the Marine Sanctuaries Act, Migratory birds. Migratory birds. As this Court recognized in Mountain States, there are many different ways to protect natural resources. Congress has created many different ways to protect marine natural resources, and the Antiquities Act is just one of those. The Marine Sanctuaries Act has what seems to be an eminent domain provision, 16 U.S.C. 1442D, and the Antiquities Act seems to have only the voluntary surrender provision. Is that a distinction between these two statutes that government has, assuming it goes through the required processes, has eminent domain power under the Marine Sanctuaries Act but doesn't under the Antiquities Act? We didn't break that point. That is a possible distinction. I think there are two easier distinctions, though, that you can make with respect to these two statutes. The first is that there are objects that the Sanctuaries Act reaches that the Antiquities Act doesn't reach. So there are areas, hypothetically, that could be designated as sanctuaries that could not be designated as monuments, and those are areas with only recreational and human use values, but that did not have objects of historic or scientific interest. Or anything the President chooses not to designate that has historic or scientific interest. Certainly. But in terms of the full reach of the statutes, my colleague did cite two examples of proclamations where the President noted that the objects of historic and scientific interest, historical and scientific interest, also had recreational values as well, but recreational values could not stand alone under the Antiquities Act. And the other distinction is the one made at the end of the OLC opinion, which is that it's clear from the text of the Sanctuaries Act, the use of the language that the Secretary of Congress has power under the Sanctuaries Act to designate sanctuaries when existing forms of protection are inadequate, that what Congress was envisioning with the Sanctuaries Act was a gap-filling measure where the Secretary could come in and enact more stringent regulations in an area that was already protected. And, again, one could see how this could play out in practice. There was an area that was designated a monument through a presidential proclamation, but decades later more recent scientific evidence demonstrated that there needed to be more stringent protections of that area, and Congress gave the Secretary of Commerce a tool to do just that. So those are two ways in which it doesn't overlap. We mentioned several others in our brief. I want to ask you about ecosystems. Ecosystems can be protected, right? Yes. And that was one of the reasons for doing that here, right? That's what the Supreme Court said in Alaska. That's what this Court said in Tulare. So what are the limits, then? I mean, could the President, say, declare an Atlantic Coast monument that would be the whole EEZ? The limits? There are a few limits in the statute. I mean, it's clearly an ecosystem. It would depend what the object would be. It would depend what? I mean, the object under the statute has to be. It would depend what? It depends what the object would be. The object has to be situated on land under control. You said the object is the entire ecosystem. It's the ecosystem, right. Over the EEZ. I think if you could make the argument that the entire EEZ was a single ecosystem, then. Well, maybe it's not one single one, but it's clearly a – whether it's one or five or six. Right. It's an ecosystem, right? It may be one or it may be many. Could the President declare an Atlantic Coast EEZ? Right. So to take your hypothetical to sort of its end point, let's say the President declares every single ecosystem in the EEZ to be a natural resource. Yeah. Okay, that's even better. Both coasts. Yeah. There's nothing in the Antiquities Act that would prevent the President from doing that. Now, Congress has the power and has exercised the power to rein in the President when it disagrees with its designations. It did that in an amendment to the Antiquities Act when it eliminated the President's authority to designate monuments in Wyoming. It did that in Anilka where it disagreed with President Carter's designation of monuments in Alaska. There have actually been – there's at least one instance of Congress disagreeing with the President's designation of a national monument, deciding that land was better served as land owned by the state and transferring it to the state. So as Judge Bosberg said, when Congress enacted the Sanctuaries Act, when it in 2014 recodified the Antiquities Act, it's acting against the backdrop of this understanding that the President, as this Court said in 2RA, has very broad authority under the Antiquities Act and is well within his right to exercise his power to rein in that authority if it so chooses. You haven't claimed – you don't claim any deference here to the extent there's ambiguity in land or control. Does the President, as part of that broad discretion, have what would in another setting be labeled Chevron-type deference? Right. I think the answer is yes. As this Court said en banc in AFL-CIO v. Kahn, when the construction of those charged with execution – the construction of a statute charged with those who execute it should be followed unless there's a compelling indication that it's wrong. And this statute has to be interpreted against the longstanding, consistent application of it to land that at the time of the proclamation is under the control of the United States, including submerged lands – both submerged lands in the ocean and submerged lands that are not in the ocean. What was the case to which you just referred? It's the 1979 case AFL-CIO v. Kahn. Judge Wright wrote the en banc opinion for the Court in that case. And was AFL-CIO against? Kahn, K-H-A-N. Who is that? Is this the CAB? Yeah. Okay. So that was – arose under the APA, then. The Court, though, spoke in broader terms than the APA. I realize that, but it was – I believe so. The occasion was by the APA, as to which the President is not an agency. Well, just because an agency heads a defendant doesn't mean it's under the APA. Yeah, I – You've got agency defendants here. I cannot remember whether the action in that case arose under the APA at that time. But, I mean, this Court certainly doesn't need to get to the point where it's looking at solely the longstanding interpretation of the President and its authority under the Act. There is a consistent judicial interpretation of both controlled and of land. And it's a congressional reauthorization. There's the congressional reauthorization in 2013, where that – against the backdrop of that consistent interpretation by the Court, there's the presumption that Congress knew of and ignores that interpretation. My colleague cites a different standard from Rapano's, dealing with a different issue. But, again – The argument about reauthorization strikes me in ordinary – in isolation as rather weak, but against the background of three, I think you said, congressional interventions to override the President. It takes on greater significance. Certainly more than three. The two big ones are Anilka and Wyoming. Yeah. But there are a number of individual instances where the President – where the Congress has come in and changed the boundaries of monuments. I think the other instance I gave was transferring the land to the State. That's how much they disagreed with the President in that instance. I see I'm out of time, so unless there are further questions – No. Okay, thank you. Thank you. We'll hear from the intervener. Good morning, Your Honors. May it please the Court. Kate DeSormo for Interveners NRDC et al. Your Honors, I'd like to respond quickly to a point that my colleague for the plaintiff appellants raised about private property. He suggested that there's some conflict with the statute – with our interpretation and the government's interpretation of the statute – that would require the statute to reach private property. That's simply not true. Our interpretation of control is not merely the authority to regulate. It is the authority to manage. And that authority, as Judge Millett pointed out, the authority to manage natural resources of the seabed, the subsoil, and the water column is expressly provided in the UN Convention on the Law of the Sea in Article 56 and in the 1983 Reagan proclamation announcing the EEZ as a matter of U.S. law. Two things. Please, I'm having a little trouble hearing you. Oh, I apologize, Your Honor. You just referenced the Law of the Sea Convention? That's right. That's distinct, I take it, from a treaty that we didn't ratify? No, that is the same convention that we did not ratify, but President Reagan in 1983 incorporated its baseline provisions into U.S. law. Incorporated what? Its baseline provisions, which is the zones of the sea that the convention set out. I see. So the convention itself is not part of our law here. That's right. Although it is customary international law, but more importantly is President Reagan's – Well, I can't sneak in after we didn't ratify it and come in as customary law. Well, that's right. But President Reagan incorporated these specific provisions, including the sovereign right to explore, exploit, conserve, and manage the natural resources, living and nonliving, of not just the seabed and the subsoil, which is the Outer Continental Shelf regime, but also the water column. So the EEZ marked a dramatic expansion of U.S. authority in this area, and specifically the type of authority that's needed to achieve the purposes of a monument reservation. And I think you argue overtakes the Fifth Circuit case. Yeah, exactly, Your Honor. The Fifth Circuit case was looking at a totally different set of facts from what we have in 2016 when this monument was established and now. And I think, importantly, there's a textual hook here, too. If you look at subsection B of the Antiquities Act, it discusses reservations for monuments, and they have to be calibrated to achieve the proper care and management of the objects to be protected. So, again, the Antiquities Act, by its terms, assumes the power to manage. So wherever the president's authority extends, the federal government needs that power to manage. We don't have, the federal government does not have the power to manage private lands. It has the power to regulate private lands. But as Judge Millett pointed out, there are no private landowners in the EEZ. There are no other sovereigns with sovereign rights. There are no state governments. So this is an area where the federal government has exclusive far-reaching control for the purposes required to achieve the proper care and management of the objects to be protected. Ships have rights of passage through the zone. They do, that's right. Can they be regulated with respect to things like discharges into the water? There are laws that apply, including in the EEZ, to discharge of pollution, and that's part of the sovereign rights that are included in the EEZ to protect. So U.S. law regulates discharges in the EEZ? That's right. Certainly within the contiguous zone, which is the first band of the EEZ, the 12 to 24 nautical mile band, the U.S. government also has sovereign rights to ensure the protection and preservation of the marine environment under international law and the 1983 Reagan proclamation. And, of course, there are... How much of this, if any, of this monument is within what you call that first tier, the contiguous zone? Part of it is, not all of it. Is it the canyons or the... I'm sorry? The canyons or any of the seamounts or not? That's right. I don't believe the seamounts are part of that. But the court doesn't need to rely on the powers that the U.S. has in the contiguous zone because the powers the U.S. has throughout the EEZ provide for jurisdiction and sovereign rights to protect the marine environments from harm, and that's part of the sovereign right and jurisdiction over the protection and preservation of the marine environment. And the U.S. government has even... has, you know, broad sovereign rights and jurisdiction for all purposes necessary to preserve these ecosystems that... I was curious about one thing in the 1983 proclamation that says it's all subject to, I guess, the rights of other nations to lay submarine cables and pipelines. That's right. Does that mean other countries could run submarine cables and pipelines throughout a national monument? That's right. That is the other international freedom that we recognize in the U.S. Exclusive Economic Zone, but it is subject to U.S. regulation. So, for example, in monuments and sanctuaries in the Exclusive Economic Zone, the federal government has a permitting system and negotiates with third parties, other countries, about the route of cables and pipelines. So, for example, if the federal government determined it was necessary... I see my time has expired, Your Honor. May I? Yeah, thank you. If the federal government determined it was necessary for the proper care and management of the objects in the monument to route a pipeline or a cable outside the monument or otherwise regulate the lane of that pipeline or cable, it could do that. And, in fact, in the Northeast Canyons Proclamation, under regulated activities, along in a list of regulated activities, it mentions the lane of cable. Thank you very much. Thank you, Your Honor. Mr. Wood, you can have your 10 seconds plus an extra 50. Thank you, Your Honor. I'll take it. I want to make two brief points to respond to the arguments on the other side, and the two that I think are perhaps the most important. The first is whether control over the territorial sea in California sheds any light on this case. And I think the answer is no, because Congress, the federal government, exercises the requisite plenary authority over the territorial sea, at least until Congress overruled that decision. And the fact that ships could pass through the territorial sea doesn't change that analysis, because the exact same thing is true on federal land. Throughout the West, you have in-holdings, which are private properties surrounded by federal government, and the owners of that property have the right to pass over federal property to get to it. But that doesn't change the fact that the federal government has pervasive authority to regulate activity on the federal land like it has on the territorial sea, but doesn't have on the exclusive economic zone. And the last thing is about whether Congress has acquiesced to this interpretation. None of the past disagreements between Congress and the President on the Antiquities Act concerned any of this text. It was more about the judgment calls for whether an area should be designated. We cite in our brief several instances where Congress took acts contrary to this interpretation, the most recent being in 2000, when it authorized the President to take limited steps in anticipation of a marine sanctuary off the coast of Hawaii. That sanctuary actually was the first marine national monument in the EEZ. If the President could do that in 2000 when that statute was issued, the statute had absolutely no practical purpose. Thank you. Thank you very much. The case is submitted.
judges: Tatel, Millett, Ginsburg